**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| STEPHEN MARINO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:08CV0767 AGF |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This action is before the Court[1] for judicial review of the final decision of the

Commissioner of Social Security, finding Plaintiff Stephen Marino was not entitled to

disability insurance benefits and supplemental security income ("SSI") under Titles II and

XVI of the Social Security Act, 42 U.S.C. §§ 401-434 and §§ 1381-1384f, respectively.

Plaintiff, who was represented by counsel during the administrative proceedings, is

proceeding pro se before the Court. For the reasons set forth below, the Commissioner's

decision shall be affirmed in part and reversed and remanded in part.

## BACKGROUND

**Procedural History**

This case is before the Court a second time. The record indicates that Plaintiff,

who was born on November 27, 1955, had received Social Security disability insurance

---

[1]    The parties have consented to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

benefits, due to mental impairments, from September 1991 until December 1993, at which point his benefits ceased because he began working. He applied for benefits again in December 1999, alleging a disability onset date of February 28, 1999, due to major depression, anxiety disorders, and personality disorders, for which he was taking a lot of medication which he claimed kept him very sedated. He asserted that he could no longer handle the stress of his job as a site manager for a housing project, and that he was terminated from this position for falling asleep on the job and for getting into constant arguments with his manager. (Tr. at 171.) Following a hearing on May 30, 2000, an Administrative Law Judge ("ALJ") found on August 29, 2000, that Plaintiff was disabled since his alleged onset date. (Tr. at 34-36.)

By letter dated November 10, 2004, the ALJ notified Plaintiff that an investigation of his receipt of benefits had been conducted and that the case had been referred to the ALJ for consideration of whether Plaintiff was engaged in, or able to engage in, substantial gainful activity ("SGA"), and whether reopening the decision for fraud or similar fault was warranted. A second hearing was held before the same ALJ on January 11, 2005. On January 28, 2005, the ALJ found that Plaintiff had engaged in SGA by illegally selling prescription drugs since his new alleged disability onset date of February 28, 1999. Accordingly, the ALJ reversed the August 29, 2000 decision that Plaintiff was entitled to benefits, and denied Plaintiff's December 1999 application. (Tr. at 13-16.)

Upon Plaintiff's action for judicial review, this Court held, by Memorandum and Order dated January 16, 2007, that the ALJ's decision that Plaintiff had engaged in SGA

was supported by substantial evidence for the period of August 2004 through the date of the ALJ's decision (January 28, 2005), but that this was not so for the period from Plaintiff's alleged onset date (February 28, 1999) through July 2004, as no evidence was presented regarding SGA during this earlier period. Accordingly, the Court affirmed the denial of benefits from August 2004, but remanded for further consideration of whether Plaintiff had engaged in SGA between February 28, 1999, and August 2004. The Court noted in addition that "[t]he record may contain evidence that would support a decision that Plaintiff fraudulently misrepresented facts in connection with his December 1999 application for disability benefits, and that he was not disabled at that time." Marino v. Barnhart, No. 4:05CV02036 AGF. Plaintiff did not appeal this decision, and therefore the conclusion that Plaintiff was not disabled from August 2004 through January 25, 2005, operates as res judicata.

Meanwhile, in March 2005, Plaintiff filed an application for SSI, due to the same impairments alleged in his earlier applications. After this application was denied at the initial administrative level on June 8, 2005 (Tr. at 344, 355-59), it was consolidated with the previous claim that had been remanded. The record indicates that Plaintiff has lived in Italy since August 2006. An SSI claimant's entitlement to benefits begins in the month after he filed his application, and he is not entitled to benefits for any month during all of which he is outside of the United States. 20 C.F.R. §§ 416.501, 416.215. Thus the consolidated proceedings before the ALJ involved (1) the remand of the reopened decision regarding the period of February 28, 1999, through July 2004, and (2) the claim

3

for SSI benefits for the period of April 2005 through July 2006.  Plaintiff waived his right to a new hearing before an ALJ, and his counsel submitted a brief in lieu of attending a hearing.

**Work History and Application Forms**

Plaintiff indicated on his December 1999 application for benefits that he was employed full time as the site manager of a multi-family apartment unit from August 1988 to February 1999, when he was terminated because he had arguments with the management, had trouble concentrating, and was found sleeping on the job.  Id. 156-57, 166, 171.  On a questionnaire dated December 15, 1999, Plaintiff wrote that his doctors told him that he should not drive or operate any machinery, that he did not "do much" other than watch TV and listen to music, that if he had to drive anywhere he would wait until two hours had passed since taking his medications, that he left his home only once or twice a week to go to the gas station or post office which were both within blocks of his house, and that he avoided people.  Id. at 152-55.

**Medical Record**

On November 30, 1999, Plaintiff's then-treating psychiatrist P. Mathews, M.D., diagnosed major depressive disorder and anxiety, and a current Global Assessment of Functioning ("GAF") score of 40.[2]  Tr. at 121-23.  On April 24, 2000, Dr. Mathews

---

[2]     A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders
(continued...)

4

noted that Plaintiff had "relapsed," id. at 81-86, and from May 1, 2000, to May 11, 2000,

Plaintiff was hospitalized with major depressive disorder and anxiety. Id. at 87-116. The

discharge notes stated that Plaintiff had multiple concerns including the death of his

father, being unemployed for the past 14 months, sciatic pain, and feelings of

hopelessness and helplessness. Id. at 75.

On July 11, 2000, examining psychologist James Nicholson, Ph.D., diagnosed

Plaintiff with a GAF score of 40. Dr. Nicholson indicated that Plaintiff was extremely

limited in his ability to cope with stress and in his reliability, with repeated episodes of

deterioration in work settings; and markedly limited in several areas of social functioning,

including the ability to accept instructions and respond to criticism. Dr. Nicholson

assessed Plaintiff's occupational ability as "poor or none" in all aspects, and wrote the

following as medical or clinical finding supporting his assessment: "Overt social

withdrawal due to anxiety and depression. Chronic anger prevents getting along with

others." Id. at 59-64.

On July 6, 2000, state agency consulting psychologist Michael Armour, Ph.D.,

upon examining Plaintiff and reviewing the medical records, assessed a current GAF of

50 and diagnosed bipolar II disorder, steroid dependence by history, anxiolytic (a

---

[2](...continued)
(4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality
testing or communication or "major" impairment in social, occupational, or school
functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores
of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

sedative) dependence by history, and depression. Dr. Armour noted that Plaintiff
attributed his difficulties in getting along with supervisors, co-workers and customers to
his ten-year use of anabolic steroids (for body building). Dr. Armour opined that Plaintiff
suffered "moderate to at times significant" impairment in the ability to interact socially
and adapt to his environment, and had a poor ability to work with or near others without
being distracted by them, to get along with co-workers and peers, and to respond
appropriately to changes in a work setting. Id. at 44-53.

The record includes monthly psychiatric treatment notes from February 2001
through November 2004, during which time Plaintiff's psychiatrist was Suren Chiganti,
M.D. Plaintiff typically reported that he was doing "okay," but also reported mood
swings and getting into arguments and physical fights with others. Prescribed
medications included, among others, Celebrex, Remeron, Klonopin, and Trazadone.
Plaintiff was often noted to be "hypo-manic," "hyper-talkative," and anxious. Id. at
255-92. By letter dated April 27, 2003, addressed to "To Whom it May Concern," Dr.
Chaganti stated that Plaintiff had recurrent major depression, memory impairment, panic
episodes, and an avoidant personality disorder. Id. at 529.

Meanwhile, on October 25, 2001, Plaintiff began seeing endocrinologist Marvin
Rosecan, M.D., whose diagnosis included growth hormone deficiency for which Dr.
Rosecan treated Plaintiff through September 1, 2004, with Nutropin (human growth
hormone therapy). During this period, Plaintiff complained of various aches and pains,

including bilateral shoulder pain, difficulty sleeping, and tingling sensation in his hands. Id. at 730-60.

On October 25, 2004, Plaintiff was seen by K. G. Thampy, M.D., in consultation for thyroid disease. Dr. Thampy noted that Plaintiff had a history of anabolic steroid abuse, and no symptoms suggestive of thyroid disease. Dr. Thampy also noted that Plaintiff was not depressed and had a good appetite. Id. at 710-11.

On December 12, 2004, Plaintiff presented to a health center for an annual physical examination and to establish care. He was seen by Elena Lejano, M.D., who noted that Plaintiff used to be a professional weight lifter, but was currently disabled. Examination results were all essentially normal, including mental status, with the exception of a diagnosis of acquired hypothyroidism, for which Plaintiff was prescribed various medications. Id. at 565-69.

On December 15, 2004, Plaintiff presented to Hilary Klein, M.D., complaining of severe anger outbursts and uncontrollable temper and requesting "a fourth opinion" and to be placed on benodiazepines for problems with his sleep and anger. Dr. Klein opined that "it was most likely" that Plaintiff was using human growth hormone for building muscle mass, and that this usage was contributing to his aggressive nature. She believed that it would be reckless to prescribe any psychotropic medications until Plaintiff was completely off human growth hormones. Id. at 597-99.

Dr. Lejano's notes from December 28, 2004, state "hypothyroidism overcorrected" and Plaintiff was told to decrease his medications. Id. at 564. At a follow-up visit on

February 17, 2005, Dr. Lejano observed that Plaintiff did not appear depressed or in acute distress, and that he had an "extremely muscular upper body." On physical examination she noted decreased range of motion of the neck, decreased lateral flexion, and some stiffness. Id. at 561.

On March 9, 2005, endocrinologist Thomas Baranski, M.D., saw Plaintiff upon referral by Dr. Lejano. Plaintiff asked for human growth hormone, but Dr. Baranski noted that clinically, Plaintiff did not appear to have growth hormone deficiency, and told Plaintiff that testing would need to be done before therapy could be re-initiated. Plaintiff said he would find another endocrinologist. Dr. Baranski also questioned the diagnosis of hypothyroidism. Id. at 588.

The record includes treatment and medical-management notes by psychiatrist George Dowell, M.D., from April through June 2005. These notes report complaints of depression and severe anger, and show diagnoses of bipolar disorder and intermittent explosive disorder. On June 28, 2005, Dr. Dowell assessed a GAF of 40-50. Id. at 525-28. By letter dated February 6, 2006, Dr. Dowell wrote that Plaintiff had been under his care since January 2005. After summarizing Plaintiff's history of psychiatric problems and treatment since 1991, Dr. Dowell diagnosed Plaintiff's GAF as a "chronic 50." Dr. Dowell reported that Plaintiff had not been working for years due to his constant irritability, insomnia, and explosive temper, and opined, "I certainly would see him as disabled." Id. at 523-24. By letter dated June 11, 2007, to Plaintiff's attorney, Dr. Dowell wrote that he had not seen Plaintiff for almost a year and that he felt that

Plaintiff's major issues were "characterological," and that Plaintiff could not work. Id. at 522.

## Evidence Related to Fraud and the Engagement in SGA

In its prior decision, the Court recounted the evidence in the record related to fraud and the engagement in SGA on the part of Plaintiff, as follows:

> On October 12, 2004, the Cooperative Disability Investigations Unit ("CDIU") for the Social Security Administration issued a Report of Investigation regarding Plaintiff. The author of the report, a CDIU detective, stated that on September 3, 2004, a St. Louis County Police narcotics detective contacted the CDIU about the ongoing investigation of the illegal sales of prescription drugs by Plaintiff and his wife. The police detective reported that Plaintiff "had been bragging to an undercover informant that he was abusing the Social Security system" and that he and his wife were fraudulently receiving Social Security disability benefits. The CDIU detective joined the investigation and learned that an undercover officer had purchased prescription drugs from Plaintiff on an unspecified date. Tr. at 196-99.

> According to the report, on September 13, 2004, the CDIU detective observed an undercover police officer and a confidential informant, both wearing body microphones, enter Plaintiff's residence. The CDIU detective heard Plaintiff negotiate over prices and instruct the officer and informant on how to use various drugs. Plaintiff said that he used steroids everyday, and that Medicare paid for them. He said that he had a prescription for OxyContin, of which he keeps 30 pills and sells the remaining 60 pills. Plaintiff also said that he had a prescription for Vicodin and that he traded it for other drugs to sell. Plaintiff said that he worked out at a gym everyday. He sold the undercover officer unspecified amounts of Xanax, Anadrol (a testosterone derivative), syringes, and Testosterone Cypionate for a total of $400. The undercover officer asked if she could bring her boyfriend to buy more drugs, and Plaintiff agreed. The CDIU detective observed the undercover officer and the informant exiting Plaintiff's home. Tr. at 199-202.

> At a debriefing following the drug buy, the informant, who knew Plaintiff "for some time," said that Plaintiff had told her in the past that he

could get the drug Ecstasy if she wanted it. The informant also said that Plaintiff kept half of his drugs in the kitchen and half in his bedroom with his money. The informant stated that Plaintiff had bragged that he was "stealing" from Social Security by telling the administration he was disabled when he was not. The informant also stated that Plaintiff had bragged about a credit card scam "he runs," and that for $1500 he would teach her how to do it. The informant reported that Plaintiff had told her that he worked out at a certain gym for two hours every morning. Tr. at 202.

On September 14 and 17, 2004, the CDIU detective observed Plaintiff working out at the gym, which was about 12 miles from his house. Another controlled buy was conducted on September 23, 2004. The undercover officer, wearing a body microphone, drove to Plaintiff's home and found Plaintiff standing in front of his house. The CDIU detective observed the two enter Plaintiff's house. Plaintiff was heard explaining the effects of the drugs he had, and saying that he rated his drugs from one to ten. Plaintiff also told the undercover officer to bring her boyfriend over to buy steroids. Plaintiff said that if the undercover officer brought her boyfriend, Plaintiff would show the boyfriend a book called "Steroids 101." Plaintiff said he would give the undercover officer a "real good deal" because Plaintiff could use the money. The undercover officer gave Plaintiff $500 in exchange for 60 Xanax pills, 60 Anadrol pills, and 30 Lasix (a diuretic) pills. The pills were in three separate baggies and Plaintiff wrote small notes indicating what pills each baggie contained and the number of milligrams. At a debriefing, the undercover detective confirmed that Plaintiff was "the primary source of the drug sale," with Plaintiff's wife present and instrumental in the sale. Tr. at 203-06.

On September 24 and 27, 2004, the CDIU detective again observed Plaintiff working out at the gym. On September 29, 2004, the CDIU detective learned that Plaintiff was receiving controlled substance prescriptions from two named doctors. On October 4, 2004, the fourth and final undercover purchase was made. The same undercover officer entered Plaintiff's home wearing a body microphone and was heard asking Plaintiff for Xanax. Plaintiff replied that he was glad to sell the officer Xanax because, "we can use the money." Plaintiff was also heard saying, "I got a Fed Ex coming tomorrow with more [drugs]." Plaintiff asked his wife, "How many pills we got back there?" His wife went into another room and returned with the Xanax, and began counting them. The undercover officer purchased 60 Xanax pills for $100. Tr. at 207-09.

On October 10, 2004, a search warrant for Plaintiff's home was executed with the purpose of seizing illegal drugs, drug money, and any information relating to the purchase and resale of illegal drugs. During the search, a .38 caliber handgun, two pouches of what appeared to be marijuana, a Fed Ex box containing 90 Anadrol pills, numerous other bottles of pills (including anti-depressants, anti-anxiety drugs, and anabolic steroids),[3] $16,900 in United States currency, three boxes of syringes, a book titled "Steroids 101," and photographs from June 2004 of Plaintiff dancing and performing with his band, were found and seized. Tr. at 209-13.[4]

## ALJ's Decision of November 17, 2007 (Tr. 317-31)

This decision was rendered by an ALJ new to the case. He recognized the res

judicata effect of this Court's decision of January 16, 2007, and stated that with respect to

Plaintiff's December 1999 application, the issue was whether Plaintiff was disabled from

---

[3]    The drugs seized were later identified as six bottles of Spironolactone (a diuretic), five bottles of Gabitril (an anti-convulsant), six bottles of Diovan (used to treat hypertension), nine bottles of Anadrol, two bottles of Alprazolam (anti-anxiety medication), one bottle of Lexapro (an anti-depressant), two bottle of Ibuprofen, one bottle of Erythromycin (an antibiotic), one bottle of Furosemide (a diuretic), one bottle of Vitamin D, one bottle of Levothyroxine (a thyroid hormone), one bottle of Cytomel (a thyroid hormone), one bottle of Valtrex (an anti-viral), six bottles of Cyanocobalamin (B12 vitamin), two bottles of ARA Test 2500 (an anabolic steroid), two bottles of Propionat QV 10 (an anabolic steroid), two bottles of Anaboul BD (an anabolic steroid), one bottle of Deca QV300 (an anabolic steroid), two bottles of Miacalcin Nasal Spray, and one tube of Clindamycin Phosphate gel (an antibiotic).

[4]    The Court, as it did in its prior decision, takes judicial notice that Plaintiff was indicted on February 24, 2005, on nine counts of criminal activity committed in September and October 2004, including one count of Social Security fraud and eight counts related to the drug activity uncovered in the above-described investigation. U.S. v. Marino, No. 4:05CR110 ERW. On June 27, 2005, Plaintiff pled guilty to one count of distribution based upon the September 23, 2004 buy, and to the forfeiture of the $16,900, and the government dismissed the other counts. On September 28, 2005, Plaintiff was sentenced to one month imprisonment.

11

February 28, 1999, through July 31, 2004, and since January 29, 2005. With respect to the application for SSI filed in March 2005, the ALJ explained that the issue was whether Plaintiff was disabled since the time he filed the application (because SSI is not retroactive to anytime prior to the filing of an application) and August 2006, when Plaintiff left the United States. The ALJ found that during these periods of time, Plaintiff had not engaged in SGA, but that he was not disabled.

The ALJ found that Plaintiff had a history of OxyContin abuse and dependency, anabolic steroid abuse and dependency, anxiolytic dependency, marijuana abuse, and "a possible substance induced mood disorder." The ALJ found that although Plaintiff had been diagnosed with a multitude of other impairments as well, including "anxiety, an avoidant personality disorder, depression, a bipolar disorder, hypertension, a growth hormone disorder, etc.," the record showed that these impairments, singularly or in combination, were never severe for 12 consecutive months with treatment. Rather, according to the ALJ, Plaintiff's complaints related to such diagnoses were related to attempts to obtain prescription drugs to sell or to abuse. The ALJ stated that therefore, he found that Plaintiff's impairments did not meet or equal the requirements of a deemed-disabling impairment listed in the Commissioner's regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ summarized the medical treatment notes through October 2004, and found that they were "very inconsistent with allegations of any mental and/or physical impairments imposing disabling limitations of function, for twelve consecutive months in

12

duration." The ALJ believed that the later medical evidence, including Dr. Buranski's notes, "when considering the evidence of his daily workouts, his 'extremely muscular' body, the prior findings of dependencies and abuse, and the evidence of his selling of human growth steroids, do indicate that [Plaintiff] was actually drug seeking and was not with the pain of deficiencies that he alleges."

The ALJ found that Dr. Dowell's February 6, 2006 opinion that Plaintiff was disabled was "very inconsistent with previous findings that [Plaintiff's] steroid abuse lends itself to his mental status changes and his aggressive nature," and that Dr. Dowell's observation that Plaintiff had difficulty getting along with people was "grossly inconsistent" with the fact that Plaintiff could work out with others on a daily basis. Dr. Dowell's statement that Plaintiff was "disabled" was not credited because it was not clear to the ALJ that Dr. Dowell understood that term as it was defined by the Social Security Act. Lastly, the ALJ stated that Dr. Dowell's June 11, 2007 opinion that Plaintiff's problems were "characterological" was not an opinion that any disability existed as the result of "a specific mental impairment."

Other factors noted by the ALJ as undermining Plaintiff's credibility regarding allegations of disability since February 1999, included the absence of treatment records since Plaintiff moved to Italy, and the absence of documented persistent and adverse side effects from his medications.

The ALJ then recounted the facts of the criminal investigation set forth above, and stated that this evidence "establishes that [Plaintiff] certainly does more than just sitting

13

around as alleged and that he has no difficulties traveling further than he alleged he can

do, . . . interacting with others, on a dance floor, in a gym, or in a social environment."

The ALJ further stated that this evidence indicated that "any complaints of [mental

problems] to treating physicians, were for the purpose of obtaining drugs for reasons

other than treatment including recreational use and sales." The ALJ found that indeed,

Plaintiff "fraudulently misrepresented facts in connection with his December 1999

application for disability benefits." The ALJ went on to comment that the facts

surrounding the criminal investigation,

> even considered outside the realm of medical records, establish that
> [Plaintiff] has not been disabled at any time since February 1999 and that
> he utilized the Social Security Administration . . . for his own personal
> profit and enjoyment. [Plaintiff's] own statement establishes that he even
> did not consider himself disabled. [Plaintiff's] own statements establish
> that he made false statements and/or misrepresented material facts to the
> Social Security Administration (and even to his treating physicians) for the
> purpose of obtaining [disability benefits] . . . .

Id. at 329.

The ALJ determined that Plaintiff "may have some difficulties coping with stress

or interacting with others," but that these were not established by the medical evidence as

existing for 12 consecutive months. The ALJ held further that Plaintiff had not met his

burden of establishing a residual functional capacity ("RFC") of severe limitations of 12-

month duration, "or at the very least," such an RFC "existing outside the realm of drug

abuse, drug dependency and drug sales." The ALJ stated that even if such disabling

limitations existed, they were "likely the result of [Plaintiff's] anabolic steroid abuse and

other drug abuses and dependencies." The ALJ referenced the statutory provision that an individual shall not be considered to be disabled if drug addiction would be a contributing factor material to the finding of disability (42 U.S.C. § 423(d)(2)(C)), and concluded that Plaintiff was not entitled to benefits based upon his December 1999 and March 2005 applications.

## DISCUSSION

### Plaintiff's Entitlement to Benefits from February 28, 1999, to August 2004

Upon remand, the ALJ in essence reached dual conclusions with respect to Plaintiff's entitlement to benefits from February 28, 2009, to August 2004: (1) that the medical evidence did not establish that Plaintiff was disabled during this period; and (2) that benefits were obtained by fraud. The Court believes that the first conclusion, standing alone, would not provide a proper basis for affirming the ALJ's decision. Absent a valid finding of fraud, there would have been no basis under 20 C.F.R. § 416.1488(a) for the ALJ to reopen the decision of August 29, 2000, which found that Plaintiff was disabled as of February 28, 1999. This regulation provides as follows with regard to the reopening of a decision in a disability case:

> A determination, revised determination, decision, or revised decision may be reopened . . . . [a]t any time if . . . [i]t was obtained by fraud or similar fault. In determining whether a determination or decision was obtained by fraud or similar fault, we will take into account any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) which you may have had at the time.

20 C.F.R. § 404.988(c) (1).

The Court will accordingly consider the ALJ's finding of fraud. The Social

Security Administrations Program Operations Manual ("POM") § GN 04020.010 defines

"fraud or similar fault" in this context as follows:

**1. Fraud**

Fraud exists when a person either:

> a. Makes or causes to be made with intent to defraud, a false statement or misrepresentation of a material fact for use in determining rights to Social Security benefits; or

> b. With intent to defraud, conceals or fails to disclose a material fact for use in determining rights to Social Security benefits.

**2. Similar Fault**

Similar fault exists when a person either:

> a. Knowingly makes an incorrect or incomplete statement that is material to the determination; or

> b. Knowingly conceals information that is material to the determination. However, fraudulent intent is not required.

The POM explains that in order to reopen a determination under this provision,

there must be a preponderance of evidence to prove the existence of fraud. If fraud

cannot be established (no preponderance of evidence establishing knowledge and intent),

but it can be established by a preponderance of evidence that the claimant did something

wrong (knowingly, but intent cannot be established), then similar fault is established and

reopening is permissible.

When an ALJ finds fraud in this context, the reviewing court's inquiry is whether the ALJ's finding that the claimant applied for benefits with fraudulent intent, is supported by substantial evidence. Britton v. Sullivan, 908 F.2d 328, 330 (8th Cir. 1990). Substantial evidence in this context "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. Courts have held that "[b]ecause errors can cause considerable hardship, [this regulation] should be liberally applied in favor of beneficiaries. See Dugan v. Sullivan, 957 F.2d 1384, 1389 (7th Cir. 1992); McCuin v. Sec'y of HHS, 817 F.2d 161, 174 (1st Cir. 1987); Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975).

Construing the record liberally in favor of the beneficiary, a close question is presented here as to whether the ALJ's finding of fraud from February 1999, is supported by substantial evidence. Upon review of the record, however, the Court believes that the ALJ's decision on this matter should be affirmed. The most damaging evidence against Plaintiff would be his own statements that he was abusing the Social Security system and getting disability benefits to which he was not entitled. The Court, however, will not base its decision on this evidence because this evidence is in the form of a hearsay allegation by a confidential informant. Nevertheless, the nature and scope of Plaintiff's drug operation -- namely, illegally selling drugs that he was obtaining from treating physicians -- lend support to the ALJ's determination that Plaintiff engaged in fraud or similar fault in obtaining his benefits pursuant to his December 1999 application.

Other evidence in the record also lends support to the ALJ's finding. Plaintiff's representations in December 1999 that he rarely left his house, avoided people, and did little more than watch TV and listen to music are at odds with the evidence from the criminal investigation (albeit from a later point in time), which showed Plaintiff interacting with others, driving to and from a gym 12 miles from his house, and playing in a band; and are undermined by the drug-seeking behavior noted by the ALJ.

**Plaintiff's Claim of Disability from March 2005 until August 2006**

The question with regard to this period is whether substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff was not entitled to SSI from March 2005, when he filed his application for such benefits, until August 2006, when he moved to Italy. In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision"; the court must "also take into account whatever in the record fairly detracts from that decision." Id. Reversal is not warranted, however, merely because substantial evidence would have supported an opposite decision. Id.

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 1392c(a)(3)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  <u>Barnhart v. Walton</u>,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 416.920, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. <u>Id.</u> § 416.921(a).

A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. <u>Id.</u> § 416.920a(c)(3).  The limitation in the first three functional areas is assigned a designation of either "none, mild, moderate, marked, [or] extreme." <u>Id.</u> § 416.920a(c)(4).  The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more."  <u>Id.</u>  When the degree of limitation in the first three functional areas is "none" or "mild" and is "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  <u>Id.</u> § 416.920a(d)(1).

The ability to do basic work activities includes the ability for understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  Id. § 416.921(b).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix 1.  If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work as he actually performed it, or as generally required by employers in the national economy.  If so, the claimant is not disabled.  If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular exertional category of work (heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional abilities.  Where a nonexertional impairment such as depression significantly

limits the claimant's ability to perform the full range of work in a particular category, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE on the availability of jobs that a person with the claimant's RFC and vocational factors could perform.  Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

Here, the Court believes that remand is warranted for the ALJ's further consideration of Plaintiff's entitlement to SSI based on Plaintiff's March 2005 application.  The ALJ found that Plaintiff failed to meet his burden at step two of the evaluation process.  Although the ALJ also made a step-three finding (failure to meet a listing impairment), the essential finding was that Plaintiff did not establish severe mental functional limitations.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir.2001).

The Court finds problematic some of the reasons given by the ALJ for discrediting evidence supporting Plaintiff's allegations with regard to the period of time at issue -- most notably, the ALJ's reasons for not giving weight to the GAF assessment of 50 by Dr. Dowell, a treating psychiatrist.  Generally, an ALJ is to give "a treating source's opinion on the issue[s] of the nature and severity of [an] impairment[ ]" controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).

The Court recognizes that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with his own treatment notes or with other substantial medical evidence contained within the record, see, e.g., Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000), but this is not the case here.  Dr. Dowell's GAF assessment of a "chronic 50" was consistent with his treatment notes, and there is no medical evidence of a higher GAF during this period.  To discount Dr. Dowell's opinion of the severity of Plaintiff's limitation because the June 11, 2007 letter did not state that the limitation existed as the result of specific mental impairment is to read the letter in isolation, and not in conjunction, with Dr. Dowell's treatment notes.

Furthermore, other than Dr. Dowell's opinion, there is no opinion in the record by a medical source addressing Plaintiff's mental ability to function in the workplace during the period at issue, nor do the medical records allow for an inference of how Plaintiff's limitations would allow him to function in a work environment.  See Cox v. Astrue, 495 F.3d 614, 620 & n. 9 (8th Cir. 2007) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.").  The Court does not believe that there is a sufficient medical basis in the record to support the ALJ's finding that if Plaintiff's mental impairments were disabling, such disability was "likely the result of [Plaintiff's] anabolic steroid abuse and other drug abuses and dependencies."  Under these

circumstances, remand is appropriate for further consideration, and if needed, further development of the record.  See Gibbons v. Astrue, No. 4:08-CV-523 CAS, 2009 WL 2948445, at *21 (E.D. Mo. Sept. 14, 2009) (reversing and remanding ALJ's decision where there was no medical evidence addressing the plaintiff's mental ability to function in the work place); see also Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003) (reversing and remanding where the plaintiff had a GAF of 50 and the ALJ did not go through the five-step evaluation process to determine the materiality of substance abuse disorder to the plaintiff's mental impairments).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** with respect to Plaintiff's December 1999 application for benefits, and **REVERSED** and **REMANDED** with respect to Plaintiff's March 2005 application.

**IT IS FURTHER ORDERED** that all pending motions are **DENIED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 29th day of September, 2009.